ShackleeoRD, J.,
delivered the opininion of the Court.
This is an action brought in the Circuit Court of Roane County, by G. W. Stout vs. E. A. Yost et als., to recover the value of a wagon and two mules, taken *207 from bim by them and others. The case was tried before a jury of Roane County, at the July Term of the Circuit Court, 1866. The facts necessary to be stated to understand the principles involved, are as follows:
In the Fall of 1863, G. W. Stout was employed by Gr. W. Wells, a citizen of Roane County, with his wagon and mules, to haul corn for him on his farm, on the south side of Tennessee River; at the time, the river was the line between the Federal and Confederate forces. The wagon and mules were worth about $600. During the day on which he was thus employed, information was given that the Confederate forces were approaching. Stout attempted to escape with his wagon and team, but was pursued by Yost and other Confederate soldiers, by orders of the commander of the force, and captured by them. He was held as a prisoner, and his wagon and mules taken and converted.
That portion of His Honor’s charge, in which it is insisted there is error, is substantially as follows:
“If the jury believe, from the proof, that Stout was a citizen, engaged in his ordinary pursuits, and using his property in his usual and legitimate business, and that Yost and the other plaintiffs in error, seized and appropriated said property, or aided or abetted in such seizure, they would be liable.”
A judgment was rendered for Stout, for the value of the mules and wagon. A new trial was moved for, which motion was overruled; from which there was an appeal in error to this Court.
*208 The only question presented for onr consideration, is: Whether Tost and others, being soldiers in the Confederate service, having arrested Stout 'and taken his property by orders of their superior officer, can be held liable in this action. The seizure and arrest is attempted to be justified on the ground that the plaintiffs in error were Confederate soldiers; that they belonged to a belligerent force; that he was within the territory claimed to be within the rebel lines, and as such, their acts were in accordance with the laws of war. This is a question of much difficulty, and one of grave importance, and upon which no direct authority can be found. After the commencement of hostilities between the insurgent forces of the revolted States, and the Federal Government, the political power of that Government awarded to those in arms, belligerent rights. That is, they exchanged prisoners, made cartels, and passed flags of truce. This was done from motives of humanity and public policy, to prevent retaliation, and to soften the stern features of war; yet, though the right was accorded to those in arms, the legislative and executive powers of the Government, by no act from the commencement to the suppression of the rebellion, recognized the existence of the Confederate Government; it was alone with the military power they held intercourse. It was a policy pursued from day to day, held under the discretion of the political power of the Government, liable to be changed or abandoned at discretion. The according to those in arms belligerent rights, gave them no authority or right to arrest or *209 take the property of private citizens. “The common laws of war, those maxims of humanity, moderation and honor, which should characterize other wars,” Vattell says, book 3, ch. 8, secs. 294 and 295, “ ought to he observed by both parties in every civil war.” “Under modern and Christian civilization, you cannot needlessly arrest or make war on husbandmen, or mechanics, or women and children:” book 8, ch, 8, sec. 149. “The rights of war are against enemies, open and armed enemies, while enemies during war, but no longer. The force used is not to exceed the exigency — not wantonly to injure private property, nor disturb private dwellings, and their peaceful inmates:” Vattell, Book 3 ch. 8, sec. 148.
The right to arrest private citizens, not engaged in arms, and to seize and appropriate their property, in civil feudes like this, cannot be tolerated; it will open the door, in future domestic dissensions, to a series of butchery, rapine, confiscation and plunder, unparalleled in history, and destructive of the rights of the people. The plaintiffs in error, were engaged in an unlawful combination to overthrow and destroy the Government; their acts were, therefore, illegal, and those who were present, aiding and abetting, are liable for the trespass.
The rights of belligerents, as recognized by international law, between two independent sovereign powers, do not apply to the case under consideration. Stout was a private citizen, not in arms, but engaged in his ordinary occupation. His arrest, and the seizure of his property, was unlawful; he was a citizen of the State, and of the United States, and although the laws of the *210 legitimate Government were, for tbe time, suspended, the occupation of the country by those in revolt to the power of the Federal Government, gave no legal sanction to their acts. They were not recognized as belligerents de jure, but practically as belligerents de facto. The distinction is plain, a recognition of belligerent rights de jure, would have been an acknowledgment on the part of the Government of the United States, of the revolted States, as that of a sovereign and independent power, the legal effect of which, would have, according to the well settled principles of international law, transferred the temporary allegiance of the citizens living within the territory thus occupied, to those who held armed occupation of it: 4 Wheaton, 246.
But, treating them as belligerents de facto, the Government reserved the power to impose such terms and conditions upon those in arms, on the suppression of the rebellion, as the future peace and security of the country might demand. This view is not inconsistent with the principles settled by the Supreme Court of the United States, in the cases known as the Prize Cases: 2 Black.
Upon an examination of the principles of those cases, it will be found, they were determined upon rules of law applicable to that class of cases. The Court said, in the determination of those cases: “That one of the objects of civil war, as of other wars, was to coerce the enemy by cutting off his resources; that the rules of war placed in that category, commercial property found at sea, belonging to any person who was a resident of the place within the actual control and de facto jurisdiction of the enemy; that the term ‘enemy’s territory,’ applied *211 to such a place, is a technical term, looking only to the fact at the time, and not to the question of right. It is enemy’s territory, because it is claimed and held in possession by an organized, hostile and belligerent power. The principle settled in those cases, was not a recognition of belligerent rights in the rebels, or a recognition of legal status in them ’ as belligerents.” It was immaterial, the Court held, whether the owner of the property was a citizen or alien, whether loyal or disloyal, and what was the status of the territory, or its inhabitants, as regards the Constitution and laws of the United States, and the asserted Constitution and laws of the rebels. The prize courts looked only to the fact, that the region was in the possession and control of a power capable of carrying on hostilities against the United States, and compelling the Government to meet' them by the exercise of belligerent rights: Dana Wheaton, 297, note 153.
These cases do not sustain and support the principles assumed for the plaintiffs in error. We cannot assent to the proposition, that ■ a peaceful citizen, engaged in no act of hostility to either party, but in the discharge of his ordinary and legitimate business, is subject to arrest, imprisonment and seizure of his property, at the will of men who have organized an insurrectionary force to overthrow and destroy their lawful government. It is according to those in arms, rights and privileges that do not belong to the officers of the lawful government. An officer has no right to impress private property, unless forced by inevitable necessity; and an order from *212 his superior officer, unless such necessity exists, is no protection to hint: Mitchell vs. Harmony, 13 Howard, 128.
The Court says, there are, without doubt, occasions in which private property may be lawfully taken possession of or destroyed, to prevent it from falling into the hands of the public enemy; and also when a military officer, charged with a particular duty, may impress private property into the public service, or take it for public use. Unquestionably, in such cases, the Government is bound to make full compensation to the owner, and the officer is not a trespasser. But, we are clearly of opinion, that in all these cases, the danger must be immediate and impending, or the necessity urgent for the public service, and such as will not admit of delay; and when the action of the civil authority would be too late in providing the means which the occasion called for.
It is impossible to define the dangers or necessities in which this power may be lawfully exercised; every case must depend on its own circumstances; it is the emergency that gives the right, and the emergency must be shown to exist, before the taking can be justified.
An officer has no right to take the private property of any individual not in arms, to insure the success of any enterprise against the public enemy, which he may deem it advisable to undertake, where the owner has done nothing to forfeit his rights. The rights of the citizen are carefully guarded by the Constitution and laws, and any invasion of those rights, without authority of law, *213 is a trespass, for which the party trespassing is liable in damages.
The law being thus rigid as to private rights, in cases between the lawful government and its own officers and citizens, we cannot recognize the principle, that those in arms against the government, can be protected in their unlawful acts. The order of the commander of the Confederate forces, to arrest and seize the property of the defendant in error, was unlawful, and no justification to them. In the case referred to, the Court says: “Upon principle, independent of the weight of judicial decision, it can never be maintained that a military officer can justify himself for doing an unlawful act, by producing the order of his superior.”
When the officer has not transcended his authority, and private rights have been invaded, the Government assumes and makes full compensation. On the termination of a war between independent powers, a treaty of peace follows, and each power assumes to pay and indemnify its own citizens for the tortuous acts of its own officers and soldiers: Halleck’s Internationat Law, 851.
Upon the suppression of the rebellion, no treaty of peace was made, nor was there any power with whom such could have been made; hence, no indemnity can be had, and the wrong committed upon citizens must remain unredressed, unless the trespassers themselves, are liable.
It follows, therefore, that the act of the plaintiffs in error, in seizing the property of Stout, was unlawful; the orders of their superior officers is no defense; they were all trespassers who were present, assisting, aiding, or *214 abetting, and must be held liable for the consequences of their illegal acts : 2 Coldwell, Davidson vs. Manlove; Wright & Cantrell vs. Overall, 2 Coldwell, 337; Wood vs. Stone, ib., 369.
There is no error in the charge of the Court, and the judgment will be affirmed.